THE MILWAUKEE GAS LIGHT COMPANY vs. THE SCHOONER " GAMECOCK."

*Ordinance of 1787 — Rights of Navigation — Towage by steam tugs — Injury to gas pipes in bed of river.*

1. A city ordinance or an act of the state legislature, forbidding vessels to drag their anchors in a navigable stream, would be invalid as far as it interfered with the rights of navigation secured by the ordinance of 1787.
2. The right of a city gas light company to lay its pipes across the bed of a navigable river within the city is subordinate to the right of vessels to the free navigation of such river.

3. It is the right of a vessel in such a case to be towed out of the river by a steam tug, and, where that is the usual and convenient method, to be so towed stern foremost and dragging an anchor at the prow.

4. If gas pipes in the bed of the river are injured by the anchor of a vessel thus getting towed, without negligence on the part of those managing the vessel, the gas company cannot recover.

APPEAL from the Circuit Court for *Milwaukee* County.

The plaintiff was incorporated in 1852, and by its charter is empowered to manufacture and sell gas for the purpose of lighting the city of Milwaukee, and any houses, etc., therein, and to lay pipe for the purpose of conducting the gas in any of the streets, avenues, lanes or alleys of said city. In 1865, for the purpose of supplying with gas a portion of said city, it laid down a large gas pipe across the Menominee river, just below a certain drawbridge, and within the lines of a street; and it claims to have laid the same five feet below the bed of the river. Prior to this, in 1864, the common council of said city had adopted an ordinance, which had not been repealed at the time this suit was brought, forbidding any vessel to be towed in the Milwaukee or Menominee rivers, within the limits of the city, by any tug or vessel propelled wholly or in part by steam, with the anchor or anchors of such vessel, so towed, drawn or dragging on the bottom of the river. In April, 1866, the defendant's schooner was being towed down the Menominee river by a steam tug, stern foremost, and with an anchor dragging at the prow, and the anchor caught said gas pipe; and the complaint herein alleges that "thereupon the officers and crew of said vessel, by means of said anchor, the cable attached thereto, and the capstan of said vessel, willfully and maliciously tore up from the bed of said river, broke and otherwise injured said gas pipe, to the damage of said plaintiff $5,000." The answer denies that the pipe was willfully and maliciously injured, and alleges that the dragging of the anchor was " a necessary and prudent act of navigation," and

the fouling of the anchor with the gas pipe an inevitable accident.

On the trial, one Wills was examined as a witness for the defense, though objected to, on grounds which will appear from the opinion. The other questions considered here arose upon the instructions. In the general charge, the jury were instructed, that " if it was a proper act of navigation for vessels passing up and down a navigable stream to drag their anchors on the bottom, if it was an act incident to the sailing of vessels and towing them out of harbors or narrow streams, an ordinance of the city could not prohibit it;" that plaintiff had a right, under its charter, to locate its pipe so as to connect the banks of the river for the purpose of transmitting gas so as to supply the whole city, though the river was not specially mentioned in its charter; but that this right was subordinate to the rights of navigation; that from the uncontradicted testimony on that subject, they must assume that the dragging of an anchor at the prow was a proper act of navigation under some circumstances; that the jury must determine whether those circumstances existed in this case; that it appeared that the vessel, at the point from which it started, could not have been ' winded,' but might have been ' winded ' farther down the river; that if the weather was such as to justify her in starting out stern foremost, with her anchor out, she was not called upon to stop in some other part of the river to wind, for the purpose of going through the draw of the bridge; that if, by proper care and diligence, the injury to the pipe might have been prevented *after* the anchor came in contact with it, plaintiff was entitled to a verdict; and that in determining that question, they were to consider whether any and what degree of publicity had been given to the fact that the pipe was there, and to consider the evidence tending to show that the captain, in the first instance, did not know of the existence of the pipe in that place. The court then refused to give certain instruc-

tions asked by the plaintiff, the sixth of which was as follows : " If the captain of the defendant vessel, upon fouling with the pipe, was informed that he had caught the gas pipe, and if, with proper and reasonable precaution, he could have prevented the injury, then defendant is liable for all injury which he could so have prevented."

Verdict for the defendant; new trial denied; and judgment upon the verdict; from which plaintiff appealed.

*James S. Brown*, for appellant, contended, that the city of Milwaukee had power under its charter to regulate the use of rivers within its limits, so as to prevent abuses and damages, and that the ordinance forbidding the dragging of anchors in the Menominee river was a valid exercise of that power. Acts of the legislature were passed in 1852, authorizing the dredging of the Milwaukee river, at the expense of the adjoining lot owners; also in 1858, authorizing the dredging of the Menominee on the same condition. Acts were also passed authorizing the city, at the expense of the tax payers, to construct a new and artificial harbor; and all this has been accomplished principally at the expense of the city and its tax payers. Every vessel that enters the Milwaukee river comes through the artificial channel, and without this outlay the river would have been almost useless. Has not the city council power to protect the channel, the bridges over the river, and the gas pipes under it, against acts of navigation unknown until 1854,* which became necessary only on account of the indisposition of vessel owners to delay for a short time, or take the trouble to wend, so as to present the bow instead of the stern ? It is said that the city ordinance is inconsistent with the ordinance of 1787, and with the provisions of our constitution declaring the rivers to be highways, etc. If that doctrine were carried

---

* The evidence showed that steam tugs were not introduced upon the Milwaukee and Menominee rivers until 1854.

to its legitimate result, there could be no bridge, even, on a river; for bridges are certainly obstructions to navigation. The right of navigation is a public right, designed for public advantage, and therefore, in its mode of use and enjoyment, to be subordinated to public convenience and necessities. It follows that it may be regulated, abridged and controlled as the law-making power shall deem most advantageous to the public; that it may be not abrogated, but subordinated to other interests which may from time to time arise. Legislation for such purposes is common, and, as a matter of every day practice, has passed unchallenged. State legislatures regulate the rights of every one over highways, prescribe the width of the tire to wagons, and authorize bridges and dams, frequently to the exclusion of rights of navigation so slight as to be deemed unimportant compared with other uses of rivers. In the case of *Willson v. The Blackbird Creek Marsh Co.*, 2 Pet. 245, where the state had authorized a dam entirely cutting off navigation within the ebb and flow of the sea, the right to do so was sustained. This decision is recognized as law in the late case of *Gilman v. Philadelphia*, 3 Wall. 729. See also *Miss. & Mo. Railroad Co. v. Ward*, 2 Black, 494; *Rex v. Russell*, 6 B. & C. 566; Angell on W. C. 557, 558. In the Wheeling Bridge case as first adjudicated, the court held, that in directing the construction of the bridge they would not provide for the occasional case of high water which might interrupt navigation under the bridge. And in holding it a nuisance in any case to erect a bridge on this great highway between states, they based their opinion partly upon an act of the legislature of Virginia, and partially upon the bridge interfering with acts of congress. *Pennsylvania v. Wheeling Bridge Co.*, 13 How. (U. S.) 578. Even from this Chief Justice TANEY dissented. Afterward congress legalized the Wheeling bridge, and the supreme court held, that, whatever the obstruction, that act was conclusive, and the previous judg-

ment was thereby arrested. 18 How. 421. The Ohio river, the Mississippi and the lakes, belong to no one state, but, under the decisions of the supreme court, are to be considered as seas. This state has complete jurisdiction of rivers which (like the Milwaukee and Menominee) are entirely within its limits; except that, by compact, the navigable waters are to be as free to the citizens of other states as to our own, without toll, impost or duty. Const. of Wis., arts. 2 and 9; Act admitting state, approved May 29, 1848, R. S. p. 1084. The right of the legislature over the Menominee is at least as great as that of the legislature of Delaware in the case of *Willson v. The Blackbird Creek Marsh Co.*, above cited. There were no laws of congress regulating the navigation of the river, with which this jurisdiction could be in conflict.

The laying of the gas pipe under the river, and the city ordinance in question, have been authorized by the legislature. Section 4 of the act incorporating the plaintiff (ch. 159, Laws of 1852) authorizes it to manufacture and sell gas, erect its works, and lay its pipes "agreeably to the terms and conditions of a contract now [then] existing between the city of Milwaukee and John Lockwood, entered into on, etc., a certified copy of which contract shall be placed on file in the office of the secretary of state." By this contract (which was in evidence) the city agrees to grant and convey to Lockwood, his heirs, executors and assigns, "the exclusive right and privilege to make all the necessary excavations, and to lay pipes for the purpose of conducting gas through or under any and all the streets, alleys, etc., in said city, *or any rivers of said city,*" etc. By the charter of the city, and its amendments, also, the authorities are authorized to dredge the river at the expense of adjoining lot owners, to construct a harbor, and to exercise the same control over rivers as over streets. Charter, ch. 1, § 1; ch. 4, § 3; ch. 7, § 9; Laws of 1853, ch. 171; Pr. & L. Laws of 1854, ch. 83; Pr. & L. Laws of 1857,

ch. 66; Pr. & L. Laws of 1858, ch. 117, § 4. As to the power of the city, by ordinance or otherwise, to protect the bottoms of rivers from being plowed, and gas works from being destroyed, see *Miller v. The City of Milwaukee*, 14 Wis. 642. See, also, *City of Milwaukee v. Gross*, 21 Wis. 241. The power to cause the river to be dredged at the public expense involved the *duty* of protecting against unnecessary injury. Where there is a constant tendency to form new sand bars, the plowing of the bottom of the river by immense anchors would increase the difficulty. The protection of the public interest against this injury by an ordinance, was within the discretion of the council, which was the exclusive judge of the necessity. In like manner it was the duty of the council to protect against unnecessary injury the gas pipes, on which so much of the comfort and safety of the citizens depended; and any reasonable ordinance for that purpose, and for the protection of the rights of the gas company, acquired under the Lockwood contract and the act of 1852, would be valid.

Counsel further argued that new improvements in the machinery or propelling power of vessels can be used only where they do not interfere with existing rights; and that as a vessel having improvements in machinery which would prevent its passing through the draw of an existing bridge over a navigable stream without destroying or injuring the bridge, could not do so without liability for the injury, so vessels could not be taken down stream by a propelling power (viz., the steam tug), which has come into existence on the Milwaukee and Menominée rivers since the rights of the plaintiff were established, without being liable for an injury done to those rights in consequence of the use of such power.

*Emmons & Van Dyke*, for respondent, cited Ordinance of 1787, art. 4; Act establishing territorial government of Wis. (R. S. p. 1076), § 12; Enabling Act (R. S. p. 1082), § 3; Const. of Wis. art. 9, § 1; *Barnes v. City of Racine*, 4 Wis.

The Milwaukee Gas Light Co. vs. The Schooner " Gamecock."

454, 466 ; *Columbus Insurance Company v. Curtenius*, 6 McLean, 209 ; id. 70, 237, 517 ; 2 Black, 485 ; 1 McLean, 337 ; 3 id. 226 ; 5 Ohio, 416 ; 2 Mich. 519 ; 5 Ind. 8, 13 ; 15 Wend. 113 ; 2 Swan, 9; 8 Barb. 239 ; 9 How. (U. S.) 643, and 13 id. 519 ; Woodb. & M. 411.

DIXON, C. J.   The great question in this case is that which relates to the duty of the company to lay its pipes so as not to interfere with the rights of navigation.   We have examined this question with much care, and are satisfied that the charge of the learned judge is a correct statement of the law applicable to the case.   A subject which has been so frequently and ably discussed elsewhere, and which was so clearly expounded by the court below, requires no further discussion at the hands of this court.   The question is settled by authority, and we fully sanction and affirm all that the court below said to the jury upon it.

If it had been error for the court to refuse the sixth instruction asked by the plaintiff, such error was   cured by the explicit language of the general charge upon the same point. The jury were directed to take all the circumstances into consideration, and if they came to the conclusion, that, after the anchor came in contact with the pipes, the injury might have been prevented by proper care and diligence on the part of the vessel owners, then the plaintiff would be entitled to a verdict. After having already thus instructed the jury, we do not think it was the duty of the court to repeat the instruction, or to give another to the same effect at the request of plaintiff.

And in the entire proceedings we see no error, except in the admission of the part owner of the vessel, Mr. Wills, as a witness.   He was admitted contrary to the provisions of chapter 17, Laws of 1863, which requires notice of his intended examination to be given. *Ernst v. Steamboat Brooklyn*, 22 Wis. 649 ; *Sika v. The Chicago & North - Western Railway Company*, 21

id. 370. But as Mr. Wills testified to no facts material to the case, or which the jury must not have found in the same way without his testimony, we hold that the error in admitting him was immaterial, and the judgment must be affirmed.

*By the Court.* — Judgment affirmed.